The STATE of Ohio, Appellant and Cross–Appellee,

v.

JOHNSON, Appellee and Cross–Appellant.

[Cite as *State v. Johnson*, 163 Ohio App.3d 132, 2005-Ohio-4243.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 04AP–539.

Decided Aug. 16, 2005.

134

Ron O'Brien, Prosecuting Attorney, and Steven L. Taylor, for plaintiff-appellant and cross-appellee.

G. Gary Tyack and Carol A. Wright, for defendant-appellee and cross-appellant.

PETREE, Judge.

{¶ 1} Plaintiff-appellant and cross-appellee, the state of Ohio, appeals, and defendant-appellee and cross-appellant, Brandon Johnson, cross-appeals from the May 17, 2004 decision and entry of the Franklin County Court of Common Pleas granting defendant's motion to suppress statements of defendant and motion to suppress identification. For the following reasons, we affirm in part and reverse in part and remand the matter to the trial court.

{¶ 2} On July 24, 2003, the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, bound over defendant, born September 11, 1985, to the Criminal Division of the Franklin County Court of Common Pleas for trial because there was probable cause to believe that defendant committed the offenses of aggravated murder, in violation of R.C. 2903.01(B), and aggravated robbery, in violation of R.C. 2911.01(A)(1), and that defendant had used a firearm, as defined in R.C. 2923.11.

{¶ 3} On August 8, 2003, defendant was indicted on one count of aggravated robbery, with a firearm specification, and one count of aggravated murder, with a firearm specification and a specification that defendant committed the aggravated murder during an aggravated robbery and that defendant either acted as the principal offender in the aggravated murder or acted with prior calculation and design. The indictment alleged that the offenses occurred on or about December 12, 2002, when defendant was 17 years old, and that Ralph Glover was the victim of the offenses.

{¶ 4} On January 5, 2004, defendant moved the trial court for an order suppressing as evidence any eyewitness identification by Junko Glover, the wife of Ralph Glover. Defendant also filed a motion to suppress oral statements defendant had made to Jennie Chapman, a former social worker for Netcare Corporation ("Netcare"), and Shaletha Sanders, defendant's juvenile-court probation officer. The state filed memoranda in opposition to these motions.

{¶ 5} A suppression hearing was held over the course of three days, April 22, 26, and 27, 2004. The evidence that was presented at the suppression hearing indicated as follows.

{¶ 6} Pursuant to a court order, Chapman completed a mental-health and a drug and alcohol assessment of defendant on January 27, 2003. Defendant was in custody at the time of this assessment. Only Chapman and defendant were present when the assessment of defendant occurred in the detention center. Generally, an assessment would take approximately two hours, but it depended on who was present and the particular juvenile. Chapman testified that if a juvenile is involved with the court system, an assessment may be part of a process to determine "what was going to happen next in terms of disposition." At the suppression hearing, Chapman identified the "court report, the assessment," that she prepared regarding defendant, which was provided to the juvenile court. According to Netcare procedure, the report would have been provided to Netcare representatives, the client's attorney, the magistrate, and any other person involved, which would include the prosecutor.

{¶ 7} At the beginning of the assessment with defendant, Chapman informed him that the assessment was court-ordered and that information provided during the assessment would be turned over to the juvenile court. According to Chapman, this statement was made in order for the juvenile to understand that information provided would not be confidential. Chapman testified that she did not think that she had informed defendant that she would share assessment information with the Columbus Police Department, but she recalled informing defendant that she would share information with his probation officer. Chapman testified that she was trained to ask open-ended questions and that she used open-ended questions with defendant.

{¶ 8} Chapman testified regarding the assessment report, which was admitted into evidence. In the report, Chapman quoted statements that defendant made during the assessment, which occurred on January 27, 2003. These statements were typed into the report at the time he made them. Chapman asked defendant about the legal charges against him at the time. Chapman recorded defendant's response as follows: "The first time I stole a car, I was like sixteen. I think I got charged with RSP [receiving stolen property]. I've stolen like three or four cars.

I was going to sell them to a chop shop. I sold them so I could buy clothes and get a couple guns." In addition, the report states:

> When asked what he needed guns for, client reported he had robbed people on three or four occasions at gunpoint, and stated "I shot someone three months ago when I was robbing them. I was AWOL, I needed food, so I would rob someone and take money, cell phones, some jewelry. This one time, there was a struggle, and I shot this guy, and then I ran. I saw on the news later that he died. I don't remember his name. I didn't turn myself in. It would have been too much to handle." Client initially stated this event occurred approximately three months ago, but then stated that he had AWOL'd from home in December 2002, and thus was somewhat unsure about the time frame. Client did not express remorse for this incident. At the conclusion of the assessment, he did state "I'm wondering if because I told you that I killed someone, I'll have to go to jail and not to placement."

Id. Chapman testified that based on her assessment of defendant, her diagnosis of defendant was "cannabis dependence and conduct disorder and alcohol abuse."

{¶ 9} Subsequent to her meeting with defendant, Chapman spoke with Sanders, defendant's juvenile-court probation officer, and informed her of defendant's statements about the homicide. Chapman also discussed the assessment with Detective Dana Farbacher from the Columbus Police Department Homicide Squad. She called him to report the statements.

{¶ 10} Sanders testified at the suppression hearing, and her testimony indicated the following. In September 2002, defendant was placed on probation for receiving stolen property (an automobile). Subsequent to being placed on probation, defendant was again arrested for receiving stolen property (an automobile). In December 2002, a magistrate of the juvenile court placed defendant on electronic monitoring. On December 9, 2002, defendant was absent without leave from his home. Defendant was arrested on December 30, 2002, and placed back into custody at the juvenile detention center. A presentence investigation ("PSI") was ordered.

{¶ 11} Sanders testified that when she learned of defendant's homicide-related statements to Chapman, she could not believe that he had confessed to a murder, as she had not heard anything about him possibly committing a murder.

{¶ 12} Subsequent to her discussion with Chapman, Sanders interviewed defendant. Although Sanders begins every PSI interview by informing the juvenile that everything he or she says will be relayed to the magistrate or the judge, she did not read defendant his *Miranda* rights prior to the questioning. According to Sanders, she did not change her interview questions as a result of talking with Chapman. At the interview, Sanders asked defendant whether he had ever fired a weapon, which was a standard question for these interviews.

Defendant responded that he had fired a weapon three months prior to the interview. When Sanders asked the follow-up question "What happened?" defendant responded, "I was trying to rob somebody and he struggled with me and I shot him. I killed him. It happened about 3 months ago and it was around Mifflin H.S. area."

{¶ 13} Sanders also testified that as a probation officer she had the ability to issue a warrant for a person's arrest, had the power to place handcuffs on individuals, and had actually placed electronic monitoring devices on individuals for whom she was responsible.

{¶ 14} John Hughes, the chief financial officer for Netcare, testified that Netcare is a behavioral healthcare provider, which is commonly described as the "front door to the Franklin County ADAMH System where we provide crisis and assessment services for people, and then link them with treatment providers for ongoing care." About seven to eight percent of its client work is court based. When Netcare gets a court referral, "the assessment is conducted to determine the needs of the client and the risk level of the individual with regard to making a referral and making a recommendation to the court." The information is provided to the court and referrals are made "for ongoing care to other providers in the ADAMH system." Hughes testified that Netcare is a nonprofit 501(C)(3) entity and that it does not directly receive federal funds. However, he acknowledged that Netcare indirectly receives federal funds.

{¶ 15} Ernest Glover, the brother of the victim, testified at the suppression hearing regarding the July 2003 bindover hearing. He recalled saying to his mother, while they were in the gallery area in the courtroom, "Mom, that's him. * * * That's the young man right there," in reference to defendant. He had never seen defendant prior to the July 2003 hearing.

{¶ 16} Dennis Hogan, chief counsel of the Juvenile Division at the Franklin County Prosecutor's Office, testified at the suppression hearing regarding the July 2003 bindover hearing. Prior to the bindover hearing, Hogan informed the wife of the victim, Glover, that she would have to testify in front of a judge at the bindover hearing and answer questions. He did not inform her that defendant would be present in the courtroom.

{¶ 17} Hogan testified that he had had a conversation with defendant's attorney, Hayes, prior to the bindover hearing, and that he had proposed a lineup procedure. The lineup would have involved six or seven individuals, and Glover would have been brought in and asked to make an identification, if possible. Defendant's attorney rejected the idea of a lineup, informing Hogan that his client did not want a lineup. Hogan did not attempt to obtain a court order for a lineup.

{¶ 18} Hogan testified that Glover, at some point during the bindover hearing, was brought into the courtroom and directed to the witness chair. After questioning her regarding the facts of the case, Hogan asked her to look around the courtroom and state whether she could identify the person who had murdered her husband. At the suppression hearing, Hogan described in detail how Glover looked around the courtroom, including the spectator area. She eventually focused on defendant at the defense table. Hogan described how Glover stared at defendant and "then she raised her right hand, extended her index finger and pointed to him and said—it's on the record, something to the effect of, 'That's him. I'll never forget his eyes,' or something to that effect." According to Hogan, there were eight to ten persons in the spectator area, a few of whom were African–American.

{¶ 19} At the suppression hearing, Hogan was asked whether the identification was necessary to establish probable cause to bind defendant over, considering defendant's statements that had been admitted. Hogan responded, "I don't know about need, but I thought if the case did go to the Common Pleas Court, the Prosecutor ought to know whether or not she was able to identify someone. I was curious."

{¶ 20} Detective Farbacher testified at the suppression hearing. Detective Farbacher was involved from the beginning in the investigation regarding the homicide of Ralph Glover. He met with Glover after the homicide, which occurred on December 12, 2002, and she provided him with a physical description of the suspects. She described one suspect as approximately six feet tall, approximately 18 to 22 years old, and as having unkempt hair. She described the other suspect as approximately five feet, eight inches tall, approximately 18 to 23 years old, and wearing a toboggan cap.

{¶ 21} Based on information obtained from other detectives regarding possible suspects in other robberies, Detective Farbacher prepared photo arrays. Glover looked at the photo arrays, but was unable to make an identification. She informed Detective Farbacher that she would be able to make an identification if she saw the perpetrators in person. When Glover met with Detective Farbacher a second time, she was able to provide more information than she provided on the night of the homicide. For example, she was able to provide a more detailed description of the vehicle that she saw the suspects use and the clothing that they had worn, and she was able to describe the weapon used in the homicide as a dark-colored handgun.

{¶ 22} On January 27, 2003, Detective Farbacher learned of a confession in the case from Chapman. Prior to receiving the information, the investigation was at a standstill. With this information, Detective Farbacher created a new photo array, which included a photograph of defendant. On January 28, 2003, Detective

Farbacher showed this array to Glover, but she was unable to recognize anyone in the array. Glover again indicated to Detective Farbacher that she believed that she would be able to make an identification of the perpetrators if she saw them in person. The photographs in the arrays that Detective Farbacher showed Glover were black and white.

{¶ 23} Glover testified at the suppression hearing regarding the circumstances surrounding the homicide and her recollection of the July 2003 bindover hearing. Her testimony indicated the following. On December 12, 2002, at approximately 5:00 p.m., Ralph Glover returned from work to the Glovers' home. He and Mrs. Glover went outside their apartment to smoke cigarettes. It was still light outside. A green automobile pulled into the parking lot, and two men exited the vehicle and approached the Glovers. One of the men pointed a gun at Mr. Glover's neck and demanded money. The other man searched Mrs. Glover for money. Mr. Glover grabbed the gunman's arm and signaled to Mrs. Glover with his eyes for her to get inside. Mrs. Glover went inside the apartment and dialed 911. While she was on the telephone, she heard a gunshot. When Mrs. Glover went outside, the gunman and the other man were gone, and Mr. Glover had been shot. Mr. Glover died from the gunshot wound.

{¶ 24} Later that evening, Mrs. Glover talked with Detective Farbacher and provided descriptions of the two men. About a week later, when Detective Farbacher showed her photo arrays, she did not identify anyone. When Detective Farbacher met with her in January 2003, he showed her another photo array. Again, Glover did not make an identification. She indicated to the detective that she wanted to see the individual in person.

{¶ 25} Glover's testimony at the suppression hearing indicated that she understood that she was required to attend the bindover hearing to discuss what had happened on the day of the homicide. She had heard, prior to the bindover hearing, that someone had been arrested for the crime. She also understood that the bindover hearing involved the issue of whether the arrested individual would be tried as an adult. Glover identified defendant at the bindover hearing. Glover recalled saying, "I don't forget his eyes," at the bindover hearing. At the suppression hearing, she testified that defendant was the only young black male in the courtroom.

{¶ 26} Dana Preisse, the juvenile court judge who presided over the bindover hearing, testified at the suppression hearing. She vividly recalled Glover's identification of defendant and stated that Glover "said something to the effect of, 'Those eyes, those eyes. I will never forget those eyes.'" The judge added that Glover "was very strong in her testimony."

{¶ 27} On May 17, 2004, the trial court issued its decision and entry as to the aforementioned suppression motions. In its decision, the trial court granted

defendant's motion to suppress the oral statements made to the Netcare employee and the juvenile-court probation officer. Regarding the statements defendant made to Chapman, the Netcare employee, the trial court determined that these statements were protected from disclosure pursuant to Section 290dd–2, Title 42, U.S.Code, and that the statements were disclosed in violation of Section 290dd–2(c), Title 42, U.S.Code. Concerning defendant's statements to Sanders, the juvenile-court probation officer, the trial court determined that those statements were obtained in violation of *Miranda,* "as no valid waiver of the Defendant's constitutional rights was obtained prior to his custodial interrogation by an agent of law enforcement." The trial court also granted defendant's motion to suppress the eyewitness identification. The court found "that the in-court identification procedure was unnecessarily suggestive and conducive to irreparable mistaken identification."

{¶ 28} The state appeals and has asserted the following three assignments of error:

First assignment of error:

The trial court erred when it suppressed defendant's homicide related admissions based upon 42 U.S.C. § 290DD–2 and related regulations, when those admissions were not "drug abuse information" or "alcohol abuse information," when those admissions did not identify defendant as a drug or alcohol abuser, and when the defense failed to prove that Netcare is a recipient of federal financial assistance.

Second assignment of error:

The trial court erred in suppressing defendant's homicide-related admissions to the juvenile court probation officer, who was conducting a routine presentence investigation, there being no requirement of *Miranda* warnings under such circumstances.

Third assignment of error:

The trial court erred when it suppressed the in-court identification of defendant by victim Junko Glover.

{¶ 29} Defendant cross-appeals from the trial court's decision and entry, assigning the following two assignments of error:

Cross-appellant's first assignment of error:

The trial court erred in failing to suppress Brandon Johnson's statements to the Netcare worker made during a court ordered drug and alcohol assessment under *Estelle v. Smith,* 451 U.S. 454, [101 S.Ct. 1866, 68 L.Ed.2d 359] (1981) and *Miranda v. Arizona,* 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966). This resulted in a denial of Brandon Johnson's Fifth and Sixth Amendment

rights as guaranteed by the U.S. Constitution as well as corresponding rights guaranteed by the Ohio Constitution.

Cross-appellant's second assignment of error:

The trial court erred in failing to suppress Brandon Johnson's statements as violating his Fifth Amendment rights under a "classic penalty" situation; such error denied Johnson his rights as guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution and Article I, § 2, 10 and 16 of the Ohio Constitution.

{¶ 30} Under its first assignment of error, the state argues that the trial court erroneously suppressed statements that defendant made to the social worker who had conducted the drug and alcohol assessment. According to the state, the confidentiality provisions contained in federal statutory and regulatory law are inapplicable to defendant's statements about the homicide.

{¶ 31} As a preliminary matter, we note that the state has withdrawn its "federal assistance" argument contained in its first assignment of error. In its reply brief, at 13, the state concedes that federal assistance exists under Section 2.12(b)(4), Title 42, C.F.R., considering Netcare's status as a 501(C)(3) entity under the Internal Revenue Code. Therefore, we need not reach the issue of whether Netcare qualified as receiving federal assistance under Section 2.12(b)(3)(i), Title 42, C.F.R. Despite the state's concession, it maintains that defendant's statements about the homicide that he made to the social worker were not confidential.

■ {¶ 32} As stated above, the trial court determined that the statements made by defendant to Chapman on January 27, 2003, must be suppressed pursuant to Section 290dd–2, Title 42, U.S.Code, which provides as follows:

(a) Requirement

Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall, except as provided in subsection (e) of this section, be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b) of this section.

(b) Permitted disclosure

(1) Consent

The content of any record referred to in subsection (a) of this section may be disclosed in accordance with the prior written consent of the patient with respect to whom such record is maintained, but only to such extent, under such

circumstances, and for such purposes as may be allowed under regulations prescribed pursuant to subsection (g) of this section.

(2) Method for disclosure

Whether or not the patient, with respect to whom any given record referred to in subsection (a) of this section is maintained, gives written consent, the content of such record may be disclosed as follows:

(A) To medical personnel to the extent necessary to meet a bona fide medical emergency.

(B) To qualified personnel for the purpose of conducting scientific research, management audits, financial audits, or program evaluation, but such personnel may not identify, directly or indirectly, any individual patient in any report of such research, audit, or evaluation, or otherwise disclose patient identities in any manner.

(C) If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor, including the need to avert a substantial risk of death or serious bodily harm. In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services. Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

(c) Use of records in criminal proceedings

Except as authorized by a court order granted under subsection (b)(2)(C) of this section, no record referred to in subsection (a) of this section may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient.

(d) Application

The prohibitions of this section continue to apply to records concerning any individual who has been a patient, irrespective of whether or when such individual ceases to be a patient.

\* \* \*

(g) Regulations

Except as provided in subsection (h) of this section, the Secretary shall prescribe regulations to carry out the purposes of this section. Such regulations may contain such definitions, and may provide for such safeguards and procedures, including procedures and criteria for the issuance and scope of orders under subsection (b)(2)(C) of this section, as in the judgment of the

Secretary are necessary or proper to effectuate the purposes of this section, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

{¶ 33} Regulations were promulgated, pursuant to statutory authority, in order to carry out the purposes of this confidentiality-of-records statute. Section 2.11, Title 42, C.F.R., provides the following definitions for purposes of these regulations:

Alcohol abuse means the use of an alcoholic beverage which impairs the physical, mental, emotional, or social well-being of the user.

Drug abuse means the use of a psychoactive substance for other than medicinal purposes which impairs the physical, mental, emotional, or social well-being of the user.

Diagnosis means any reference to an individual's alcohol or drug abuse or to a condition which is identified as having been caused by that abuse which is made for the purpose of treatment or referral for treatment.

Disclose or disclosure means a communication of patient identifying information, the affirmative verification of another person's communication of patient identifying information, or the communication of any information from the record of a patient who has been identified.

 * * *

Patient means any individual who has applied for or been given diagnosis or treatment for alcohol or drug abuse at a federally assisted program and includes any individual who, after arrest on a criminal charge, is identified as an alcohol or drug abuser in order to determine that individual's eligibility to participate in a program.

 * * *

Records means any information, whether recorded or not, relating to a patient received or acquired by a federally assisted alcohol or drug program.

{¶ 34} Section 2.12, Title 42, C.F.R., provides as follows:

(a) General—

(1) Restrictions on disclosure. The restrictions on disclosure in these regulations apply to any information, whether or not recorded, which:

(i) Would identify a patient as an alcohol or drug abuser either directly, by reference to other publicly available information, or through verification of such an identification by another person; and

(ii) Is drug abuse information obtained by a federally assisted drug abuse program after March 20, 1972, or is alcohol abuse information obtained by a federally assisted alcohol abuse program after May 13, 1974 (or if obtained before the pertinent date, is maintained by a federally assisted alcohol or drug abuse program after that date as part of an ongoing treatment episode which

extends past that date) for the purpose of treating alcohol or drug abuse, making a diagnosis for that treatment, or making a referral for that treatment.

(2) Restriction on use. The restriction on use of information to initiate or substantiate any criminal charges against a patient or to conduct any criminal investigation of a patient (42 U.S.C. 290ee–3(c), 42 U.S.C. 290dd–3(c)) applies to any information, whether or not recorded which is drug abuse information obtained by a federally assisted drug abuse program after March 20, 1972, or is alcohol abuse information obtained by a federally assisted alcohol abuse program after May 13, 1974 (or if obtained before the pertinent date, is maintained by a federally assisted alcohol or drug abuse program after that date as part of an ongoing treatment episode which extends past that date), for the purpose of treating alcohol or drug abuse, making a diagnosis for the treatment, or making a referral for the treatment.

(b) Federal assistance. An alcohol abuse or drug abuse program is considered to be federally assisted if:

\* \* \*

(3) It is supported by funds provided by any department or agency of the United States by being:

(i) A recipient of Federal financial assistance in any form, including financial assistance which does not directly pay for the alcohol or drug abuse diagnosis, treatment, or referral activities; or

(ii) Conducted by a State or local government unit which, through general or special revenue sharing or other forms of assistance, receives

Federal funds which could be (but are not necessarily) spent for the alcohol or drug abuse program; or

(4) It is assisted by the Internal Revenue Service of the Department of the Treasury through the allowance of income tax deductions for contributions to the program or through the granting of tax exempt status to the program.

\* \* \*

(d) Applicability to recipients of information—

(1) Restriction on use of information. The restriction on the use of any information subject to these regulations to initiate or substantiate any criminal charges against a patient or to conduct any criminal investigation of a patient applies to any person who obtains that information from a federally assisted alcohol or drug abuse program, regardless of the status of the person obtaining the information or of whether the information was obtained in accordance with these regulations. This restriction on use bars, among other things, the introduction of that information as evidence in a criminal proceeding and any other use of the information to investigate or prosecute a patient with respect

to a suspected crime. Information obtained by undercover agents or informants (see § 2.17) or through patient access (see § 2.23) is subject to the restriction on use.

\* \* \*

(e) Explanation of applicability—

(1) Coverage. These regulations cover any information (including information on referral and intake) about alcohol and drug abuse patients obtained by a program (as the terms "patient" and "program" are defined in § 2.11) if the program is federally assisted in any manner described in § 2.12(b). Coverage includes, but is not limited to, those treatment or rehabilitation programs, employee assistance programs, programs within general hospitals, school-based programs, and private practitioners who hold themselves out as providing, and provide alcohol or drug abuse diagnosis, treatment, or referral for treatment. However, these regulations would not apply, for example, to emergency room personnel who refer a patient to the intensive care unit for an apparent overdose, unless the primary function of such personnel is the provision of alcohol or drug abuse diagnosis, treatment or referral and they are identified as providing such services or the emergency room has promoted itself to the community as a provider of such services.

(2) Federal assistance to program required. If a patient's alcohol or drug abuse diagnosis, treatment, or referral for treatment is not provided by a program which is federally conducted, regulated or supported in a manner which constitutes Federal assistance under § 2.12(b), that patient's record is not covered by these regulations. Thus, it is possible for an individual patient to benefit from Federal support and not be covered by the confidentiality regulations because the program in which the patient is enrolled is not federally assisted as defined in § 2.12(b). For example, if a Federal court placed an individual in a private for-profit program and made a payment to the program on behalf of that individual, that patient's record would not be covered by these regulations unless the program itself received Federal assistance as defined by § 2.12(b).

(3) Information to which restrictions are applicable. Whether a restriction is on use or disclosure affects the type of information which may be available. The restrictions on disclosure apply to any information which would identify a patient as an alcohol or drug abuser. The restriction on use of information to bring criminal charges against a patient for a crime applies to any information obtained by the program for the purpose of diagnosis, treatment, or referral for treatment of alcohol or drug abuse. (Note that restrictions on use and disclosure apply to recipients of information under § 2.12(d).)

(4) *How type of diagnosis affects coverage.* These regulations cover any record of a diagnosis identifying a patient as an alcohol or drug abuser which is prepared in connection with the treatment or referral for treatment of alcohol or drug abuse. A diagnosis prepared for the purpose of treatment or referral for treatment but which is not so used is covered by these regulations. The following are not covered by these regulations:

(i) diagnosis which is made solely for the purpose of providing evidence for use by law enforcement authorities; or

(ii) A diagnosis of drug overdose or alcohol intoxication which clearly shows that the individual involved is not an alcohol or drug abuser (e.g., involuntary ingestion of alcohol or drugs or reaction to a prescribed dosage of one or more drugs).

{¶ 35} Section 2.3, Title 42, C.F.R., provides that the regulations are to be strictly construed in favor of a potential violator in the same manner as a criminal statute because there is a criminal penalty for violating the regulations.

{¶ 36} Preliminarily, we note that defendant did not provide prior written consent for disclosure pursuant to Section 290dd–2(b)(1), Title 42, U.S.Code. Moreover, the state apparently does not dispute that defendant was a "patient," as that term is defined in Section 2.11, Title 42, C.F.R. However, we need not reach the issue of whether defendant was a patient, as we find that the statements about the homicide were not protected from disclosure and use under federal law.

{¶ 37} Section 2.12(a), Title 42, C.F.R., sets forth the restrictions on the disclosure and use of information. The restrictions on use and disclosure contained in Section 2.12(a), Title 42, C.F.R., are limited in application to particular information, namely identifying information, drug-abuse information, and alcohol-abuse information. Contrary to defendant's argument, Sections 2.12(e)(3) and (4), Title 42, C.F.R., do not further restrict the information that may be used or disclosed as otherwise provided in Section 2.12(a), Title 42, C.F.R. Section 2.12(e)(3), Title 42, C.F.R., explains a difference between the restriction on the use of information and the restrictions on the disclosure of information, and Section 2.12(e)(4), Title 42, C.F.R., explains how the type of diagnosis affects coverage.

{¶ 38} Defendant points out to this court that "records," as defined in Section 2.11, Title 42, C.F.R., means "any information, whether recorded or not, relating to a patient received or acquired by a federally assisted alcohol or drug program." We agree that the term records is given a broad meaning for purposes of the federal scheme. However, we note that Section 290dd–2(a), Title 42, U.S.Code, provides for the confidentiality of "[r]ecords of the *identity, diagnosis, prognosis,* or *treatment* of any patient," (emphasis added) and that

Section 2.12(a), Title 42, C.F.R., specifies the restrictions on the disclosure and use of certain information.

{¶ 39} Defendant's statements about the homicide were not alcohol-abuse information or drug-abuse information. During the questioning process relating to the drug and alcohol assessment, defendant made statements to the social worker revealing that he had shot and killed someone. Defendant essentially informed the social worker that he had stolen vehicles in order to make money from "chop shops," and that he would use this money to buy guns. He would use the guns to rob persons for more money, cell phones, and jewelry. Defendant indicated to the social worker that during one of these robberies he shot and killed someone. There is no indication that these statements directly related to drug abuse or alcohol abuse, as those terms are defined in Section 2.11, Title 42, C.F.R. Furthermore, although defendant's statements related to his "moral lapses," which may be symptoms of substance abuse, we do not believe that this makes the information alcohol-abuse information or drug-abuse information in this case. Therefore, defendant's statements about the homicide were not alcohol-abuse information or drug-abuse information.

{¶ 40} Additionally, the statements did not identify defendant as a drug or alcohol abuser, and they did not otherwise reveal any diagnosis, prognosis, or treatment of defendant.

{¶ 41} Under our interpretation of the federal confidentiality scheme at issue in this case, including the federal regulation explaining the applicability of the restrictions on disclosure and the restriction on use of information, we conclude that defendant's statements about the homicide were not protected from disclosure and use.

{¶ 42} Considering the foregoing, we sustain the state's first assignment of error, as the trial court erred when it granted the motion to suppress defendant's statements about the homicide that he made to the social worker.

{¶ 43} In its second assignment of error, the state argues that the trial court erred in suppressing defendant's statements to the probation officer because a *Miranda* warning was unnecessary.

{¶ 44} The Fifth Amendment to the United States Constitution provides persons with a privilege against self-incrimination, which is applicable against the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653. The privilege against self-incrimination is also guaranteed by Section 10, Article I, of the Ohio Constitution, which provides, "No person shall be compelled, in any criminal case, to be a witness against himself." Pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 471–472, 86 S.Ct. 1602, 16 L.Ed.2d 694, an individual must be advised of

his constitutional rights when law-enforcement officers initiate questioning after he has been taken into custody or otherwise deprived of his freedom in any significant way.

{¶ 45} According to the state, "[r]outine presentence investigations do not require *Miranda* warnings." In support of this proposition, the state cites *United States v. Rogers* (C.A.10, 1990), 921 F.2d 975, which states that "[a] routine post-conviction presentence interview by a probation officer does not constitute the type of inherently coercive situation and interrogation by the government for which the *Miranda* rule was designed. That is true even though the defendant is in custody and the consequence of an admission might be more severe punishment." Id. at 979.

{¶ 46} In *State v. Roberts* (1987), 32 Ohio St.3d 225, 513 N.E.2d 720, the Supreme Court of Ohio addressed the issue "whether statements made by an in-custody probationer to his probation officer, without prior *Miranda* warnings, are admissible in a subsequent criminal proceeding." Id. at 227, 513 N.E.2d 720. In its analysis of the primary issue before it, the *Roberts* court recognized that although the United States Supreme Court had not addressed the particular issue, the court, in *Minnesota v. Murphy* (1984), 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409, determined that "the coercion inherent in custodial interrogation is not present in a *prearranged, routine* probation interview." (Emphasis sic.) *Roberts*, 32 Ohio St.3d at 227, 513 N.E.2d 720, citing *Murphy*. Furthermore, as noted by the court in *Roberts* at 227, 513 N.E.2d 720, the *Murphy* court at 429, 104 S.Ct. 1136, 79 L.Ed.2d 409, fn. 5, stressed the fact that the probationer in that case was not in custody: "We emphasize that Murphy was not under arrest and that he was free to leave at the end of the meeting. A different question would be presented if he had been interviewed by his probation officer while being held in police custody or by the police themselves in a custodial setting."

{¶ 47} The *Roberts* court also recognized that other jurisdictions were in conflict over the issue before it. After surveying the case law in other jurisdictions, most of which "turn[ed] on whether a probation officer is a 'law enforcement officer' under *Miranda*," [1] the *Roberts* court resolved that "the better rule is followed in those jurisdictions which require a probation officer to give *Miranda* warnings prior to questioning an *in-custody* probationer." Id., 32 Ohio St.3d at 231, 513 N.E.2d 720. (Emphasis sic.) Accordingly, the *Roberts* court held as follows:

> Statements by an in-custody probationer to his probation officer are inadmissible in a subsequent criminal trial, where prior to questioning, the probation

---

1. *Roberts*, 32 Ohio St.3d at 227, 513 N.E.2d 720.

officer failed to advise the probationer of his *Miranda* rights as required by Section 10, Article I of the Ohio Constitution and by the Fifth and Fourteenth Amendments to the United States Constitution.

*Roberts,* at syllabus.

{¶ 48} In the case at bar, defendant was in custody at the time the probation officer interviewed him, the PSI was prearranged, and the probation officer did not advise defendant of his *Miranda* rights. The interview was not entirely routine, considering the information that was provided to the probation officer prior to her interview with defendant. Prior to interviewing defendant for the PSI, the probation officer was informed that defendant had confessed to shooting and killing someone. Armed with this type of knowledge, a probation officer necessarily would be interested in questioning a defendant regarding the issue. Sanders testified that she did not change her standard interview questions as a result of talking with Chapman. It was unnecessary for Sanders to change her questions in order to elicit an answer addressing the issue whether defendant had recently fired a gun. Additionally, in order to obtain a more detailed explanation regarding the circumstances of defendant's shooting a gun, Sanders did ask the follow-up question "What happened?" The fact that Sanders might have asked defendant whether he had fired a gun, even if she had no knowledge of the confession, does not change the analysis. The presentence interview by the probation officer was not entirely routine, as the probation officer had information that defendant had confessed to shooting and killing someone, which was a different crime than the one that led to the presentence investigation in the first place.

{¶ 49} In view of the applicable case law and the facts of this case, defendant's statements about the homicide to the probation officer must be suppressed. Therefore, we overrule the state's second assignment of error.

{¶ 50} The state contends in its third assignment of error that the trial court erred in suppressing the in-court eyewitness identification of defendant by Glover. As noted above, the trial court granted defendant's motion to suppress identification on the basis that the "in-court identification procedure was unnecessarily suggestive and conducive to irreparable mistaken identification."

{¶ 51} Unreliable identification testimony is excludable under the Due Process Clause of the United States Constitution. *State v. Marbury,* Franklin App. No. 03AP–233, 2004-Ohio-3373, 2004 WL 1445224, at ¶ 56, citing *State v. Salwan* (May 30, 1996), Cuyahoga App. No. 68713, 1996 WL 284857. "In the context of eyewitness identification testimony, an impermissibly suggestive identification procedure will be suppressed due to the substantial likelihood of irreparable misidentification." *Marbury,* citing *Neil v. Biggers* (1972), 409 U.S. 188, 198,

93 S.Ct. 375, 34 L.Ed.2d 401. "It is the likelihood of misidentification which violates a defendant's right to due process * * *." *Biggers,* 409 U.S. at 198, 93 S.Ct. 375, 34 L.Ed.2d 401. The central issue is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Id. at 199, 93 S.Ct. 375, 34 L.Ed.2d 401. Thus, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140. However, "[a]n unnecessarily suggestive identification process does not violate due process if such identification possesses sufficient indicia of reliability." *State v. Parker* (1990), 53 Ohio St.3d 82, 87, 558 N.E.2d 1164, citing *Manson,* supra.

{¶ 52} When determining whether an identification is admissible, the Sixth Circuit Court of Appeals follows a two-step analysis. See *United States v. Crozier* (C.A.6, 2001), 259 F.3d 503. The first step is to determine whether the identification procedure was impermissibly suggestive. *United States v. Hill* (C.A.6, 1992), 967 F.2d 226. The second step is to determine whether "under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible." Id.

{¶ 53} In analyzing "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive * * *, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers,* 409 U.S. at 199, 93 S.Ct. 375, 34 L.Ed.2d 401. The corrupting effect of any suggestive identification procedure must be weighed against these factors. *Manson,* 432 U.S. at 114–116, 97 S.Ct. 2243, 53 L.Ed.2d 140.

{¶ 54} The Sixth Circuit Court of Appeals, in *Hill,* determined that the admissibility of in-court identifications is subject to the "totality of the circumstances" analysis of *Biggers.* See *State v. Herring* (2002), 94 Ohio St.3d 246, 254, 762 N.E.2d 940, citing *Hill; State v. Taylor,* Cuyahoga App. No. 83551, 2004-Ohio-4468, 2004 WL 1900333, at ¶ 11, citing *Hill.* The *Hill* court, 967 F.2d at 232, held as follows:

[T]he *Biggers* analysis applies to such in-court identifications for the same reasons that the analysis applies to impermissibly suggestive pre-trial identifications. The due process concerns are identical in both cases and any attempt to draw a line based on the time the allegedly suggestive identification technique takes place seems arbitrary. All of the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake,

and the threat to due process are no less applicable when the identification takes place for the first time at trial.

█ {¶ 55} An in-court identification typically occurs under circumstances that suggest the identity of the defendant. Here, the trial court determined that during the bindover hearing defendant was dressed in clothing from the Department of Youth Services and may have been handcuffed and that he was the only young African–American male seated at the defense table. Also, Glover understood the purpose of the bindover hearing, and she knew that someone had been arrested in connection with the death of her husband. Even assuming, arguendo, that the identification procedure was impermissibly suggestive, the identification possessed sufficient indicia of reliability to comply with due process.

{¶ 56} The identification that occurred in this case was sufficiently reliable to permit its admission into evidence. Suggestive, out-of-court procedures, which could have possibly invalidated the in-court identification, are absent from this case. Furthermore, Glover made her identification under oath, in court, and presumably was subject to cross-examination. A cross-examination of an identifying witness can be used "to test [an] identification before it harden[s]." *Moore v. Illinois* (1977), 434 U.S. 220, 230, 98 S.Ct. 458, 54 L.Ed.2d 424, fn. 5. Glover testified that from the time the two men had approached her, until she went inside the apartment, about 70 to 75 seconds elapsed. Glover's testimony indicated that she was within a few feet of the gunman and she "was staring at the person who had a gun, his eyes."

█ {¶ 57} Glover's inability or unwillingness to make an identification based on the black-and-white-photo arrays did not discredit her in-court identification of defendant at the bindover hearing. See *State v. Satterwhite*, Franklin App. No. 04AP–964, 2005-Ohio-2823, 2005 WL 1356445, at ¶ 38 (stating that the particular witness's "inability to identify [the defendant] at the photo array does not discount his in-court identification"). The bindover hearing occurred over seven months after the homicide. When Glover was provided the opportunity to view defendant in person at the hearing, she was confident in her identification. The testimony of the juvenile court judge and the prosecutor revealed the certainty of Glover's identification. Moreover, Glover's understanding of the bindover process did not render her identification unreliable.

█ {¶ 58} In reaching its decision concerning the eyewitness identification, the trial court noted that the state could have sought a court order for a lineup when defendant was identified as a suspect in January 2003. The trial court stated that a defendant may be compelled to participate in a lineup prior to trial. See *United States v. Wade* (1967), 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *State v. Clement* (Dec. 30, 1988), Franklin App. No. 87AP–900, 1988 WL 142115.

However, the fact that the state did not attempt to obtain a court-ordered lineup does not change the analysis in this case. Moreover, although the state did not seek a court-ordered lineup, the prosecuting attorney did propose to defense counsel that a lineup occur. Defendant rejected this proposal.

{¶ 59} Based on the foregoing, we find that the trial court erred in determining that the "in-court identification procedure was unnecessarily suggestive and conducive to irreparable mistaken identification," as Glover's identification of defendant complied with due process. Therefore, we conclude that the trial court erred in granting defendant's motion to suppress the eyewitness identification. Accordingly, the state's third assignment of error is sustained.

{¶ 60} By his first cross-assignment of error, defendant argues that his statements to the social worker should have been suppressed *Estelle v. Smith* (1981), 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359, and *Miranda,* supra. Specifically, defendant argues that the trial court erred in not finding that his statements to Chapman must be suppressed as a violation of *Miranda* and his Fifth Amendment right against self-incrimination. Defendant contends that *Estelle* is dispositive of the issue raised by his first cross-assignment of error.

{¶ 61} "Generally, social workers have no duty to provide *Miranda* warnings because they are private individuals without the power to arrest." *State v. Thoman,* Franklin App. No. 04AP-787, 2005-Ohio-898, 2005 WL 488390, ¶ 7, citing *Columbus v. Gibson* (Dec. 15, 1992), Franklin App. No. 92AP-570, 1992 WL 414469. Chapman was not a "law enforcement officer," as that term is defined in R.C. 2901.01(A)(11), nor was Chapman acting as an agent of the police. See *Thoman* at ¶ 10.

{¶ 62} In *Estelle,* the trial court informally ordered the psychiatric examination of the defendant in order to determine whether he was competent to stand trial for capital murder. Id., 451 U.S. at 456–457, 101 S.Ct. 1866, 68 L.Ed.2d 359. The examining doctor determined that the defendant was competent, and the defendant was subsequently tried by a jury and convicted of murder. Id. at 457, 101 S.Ct. 1866, 68 L.Ed.2d 359. In the penalty phase, the psychiatrist testified for the prosecution based on his mental-status examination of the defendant, which was the examination ordered to determine competency. Id. at 460, 101 S.Ct. 1866, 68 L.Ed.2d 359. The *Estelle* court noted that when the psychiatrist "went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." Id. at 467, 101 S.Ct. 1866, 68 L.Ed.2d 359. The court concluded that "when faced while in custody with a court-ordered psychiatric inquiry, [the defendant's] statements to [the psychiatrist] were not 'given freely

and voluntarily without any compelling influences' and, as such, could be used
* * * only if [the defendant] had been apprised of his rights and had knowingly
decided to waive them." Id. at 469, 101 S.Ct. 1866, 68 L.Ed.2d 359, citing
*Miranda,* 384 U.S. at 478, 86 S.Ct. 1602, 16 L.Ed.2d 694. Regarding this holding,
the *Estelle* court provided the following caveat: "Of course, we do not hold that
the same Fifth Amendment concerns are necessarily presented by all types of
interviews and examinations that might be ordered or relied upon to inform a
sentencing determination." *Estelle,* 451 U.S. at 469, 101 S.Ct. 1866, 68 L.Ed.2d
359, fn. 13.

{¶ 63} We do not find this holding in *Estelle* to be controlling in the case at bar.
In this case, defendant, in a minimum, consented to the drug and alcohol
assessment. A fair interpretation of the proceeding before the magistrate on
January 9, 2003, reveals that defendant's counsel at the time indicated the
appropriateness of a drug and alcohol assessment. Significantly, defendant's
counsel at the time stated, "Brandon, on one hand, seems to be a smart kid,
seems to be, you know, like a lot going for him. And then on the other hand it's
like he's out of control. So, you know, he knows it. And we need to figure what's
going on here before he gets killed or hurts, you know, hurts somebody * * *."
When viewed in context, it is clear defendant's counsel was referring to the
appropriateness of a drug and alcohol assessment in addition to a "reclaim
staffing." Therefore, although the drug and alcohol assessment was ordered by
the juvenile court, defendant's counsel, to a certain extent, requested the assess-
ment. Defendant voluntarily made his incriminating statements during the
requested drug and alcohol assessment.

{¶ 64} In addition to alleging a Fifth Amendment violation, defendant
argues that *Estelle* supports a finding that the Sixth Amendment was violated in
this case. The state asserts that defendant's Sixth Amendment claim was not
litigated before the trial court. Even if defendant has not waived this argument,
we find it to be unpersuasive.

{¶ 65} The Sixth Amendment to the United States Constitution, made applica-
ble to the states through the Fourteenth Amendment, provides that "[i]n all
criminal prosecutions, the accused shall enjoy the right * * * to have the
Assistance of Counsel for his defense." The *Estelle* court determined that "the
death penalty was improperly imposed on [the defendant] because the psychiatric
examination on which [the psychiatrist] testified at the penalty phase proceeded
in violation of [the defendant's] Sixth Amendment right to the assistance of
counsel." *Estelle,* 451 U.S. at 471, 101 S.Ct. 1866, 68 L.Ed.2d 359. The *Estelle*
court noted, "Our holding based on the Fifth and Sixth Amendments will not
prevent the State in capital cases from proving the defendant's future dangerous-
ness as required by statute. A defendant may request or consent to a psychiatric

examination concerning future dangerousness in the hope of escaping the death penalty." Id. at 472, 101 S.Ct. 1866, 68 L.Ed.2d 359.

{¶ 66} In *Estelle,* defense counsel were not notified in advance that the psychiatric examination would involve the issue of the defendant's future dangerousness, a critical issue for purposes of sentencing. Here, defendant, through his counsel, requested the drug and alcohol assessment. It was during this requested assessment process that defendant voluntarily made incriminating statements to the social worker.

{¶ 67} Considering the foregoing, we conclude that defendant's statements to the social worker about the homicide were not obtained in violation of the Fifth or Sixth Amendments, and we accordingly overrule defendant's first cross-assignment of error.

{¶ 68} In his second cross-assignment of error, defendant contends that his statements to the social worker and the probation officer should have been suppressed on the basis that he was placed in a "classic penalty" situation and his Fifth Amendment right against self-incrimination was therefore violated.

{¶ 69} As determined above, defendant's statements to the probation officer were properly suppressed by the trial court. Thus, to the extent that defendant's second cross-assignment of error relates to his statements to the probation officer, it is moot. However, we must determine whether defendant's statements to the social worker should have been suppressed on the basis that defendant was placed in a "classic penalty" situation.

{¶ 70} In *Murphy,* supra, the United States Supreme Court stated that "[t]he general rule that the [Fifth Amendment] privilege must be claimed when self-incrimination is threatened has also been deemed inapplicable in cases where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and * * * compe[l] * * * incriminating testimony.'" Id. at 434, 104 S.Ct. 1136, 79 L.Ed.2d 409, quoting *Garner v. United States* (1976), 424 U.S. 648, 661, 96 S.Ct. 1178, 47 L.Ed.2d 370. See *State v. Evans* (2001), 144 Ohio App.3d 539, 556, 760 N.E.2d 909 (applying the "classic penalty" doctrine).

{¶ 71} Defendant argues that his incriminating statements were involuntary, as he "had no real choice but to answer the questions of both Chapman and Sanders." Defendant asserts that he was under a court order to participate in the alcohol-and-substance-abuse assessment and PSI, and he cites testimony at the suppression hearing indicating that any uncooperativeness would be reported to the magistrate. Defendant states that he "reasonably believed that failure to cooperate and answer questions would result in a substantial penalty, i.e. incarceration." Id. Chapman reported that defendant "was extremely anxious about his upcoming court hearing due to concerns that the magistrate would send him

to the Department of Youth Services," which defendant viewed as "jail." Defendant wanted to go to "Buckeye Boys Ranch."

{¶ 72} The pressure on defendant to make statements to the social worker for purposes of the assessment, in order to be viewed favorably, did not rise to the level of compulsion forbidden by the Fifth Amendment. Defendant's choice between making self-incriminating statements to the social worker or risk a perceived undesired consequence did not result in an unconstitutional compulsion. Defendant's choice was not between self-incrimination and incarceration. Furthermore, to some extent, defendant requested the alcohol and drug assessment. Defendant's statements to the social worker regarding the homicide were not compelled in violation of the Fifth Amendment, as a classic penalty situation did not occur in this case.

{¶ 73} Based on the foregoing, defendant's second cross-assignment of error is overruled.

{¶ 74} In sum, we sustain the state's first and third assignments of error, overrule its second assignment of error, and overrule both of defendant's cross-assignments of error. Accordingly, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.

> Judgment affirmed in part
> and reversed in part,
> and cause remanded.

FRENCH and McCORMAC, JJ., concur.

McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.