DECISION.
{¶ 1} Defendant-appellant Faye Harriel has appealed from her conviction for the murder of her husband, Gregory Roaden. For the following reasons, we affirm Harriel's conviction.
 I. Witnesses for the Prosecution {¶ 2} Harriel, Roaden, and Harriel's four children resided together on Fairmount Avenue in Cincinnati. On January 16, 2004, around 1:30 p.m., Harriel called 911 and reported that her husband had died. Harriel told the 911 operator that Roaden had passed away around 1:00 a.m. that same day. The Cincinnati Fire Department responded to the call; upon arriving at Harriel's home, the firefighters found Roaden deceased on his bedroom floor.
 {¶ 3} Harriel was indicted for both aggravated murder and murder following Roaden's death. A trial to the bench proceeded after Harriel waived her right to a jury trial. Testimony was elicited from numerous witnesses, which we summarize as succinctly as possible.
 {¶ 4} Lieutenant Robert Johnson of the Cincinnati Fire Department testified that Harriel was waiting outside for the firefighters when they arrived at her home. Harriel escorted them inside, and immediately upon entering the house, Johnson noticed a strong chemical odor. Other witnesses corroborated this odor and identified it as bleach. According to Johnson, the chemical fumes were so strong that he could feel them in his eyes. Johnson testified that rigor mortis had already occurred in Roaden's body upon the firefighters' arrival. He further stated that Harriel told him that she had changed Roaden's clothes before calling 911, because she wanted to make him presentable.
 {¶ 5} Cincinnati Police Officer Terrance Sherman testified regarding statements made by Harriel during the investigation. Harriel told Sherman that Roaden had returned home around 11:00 p.m. on January 15. Harriel stated that she was asleep when Roaden arrived home, but she awoke around 1:00 a.m. and realized that Roaden was lying next to her in bed, deceased. Harriel further told Sherman that Roaden had suffered from abdominal pains the prior day.
 {¶ 6} Cincinnati Police Detective Brian Trotta testified that Harriel had told him that she had not seen Roaden since he left home at approximately 4:00 p.m. on January 15, until she awoke around 1:00 a.m. on January 16 and discovered that her husband was deceased in bed. Harriel further told Trotta that she had attempted to clean Roaden's body, change his clothes, and move him from the bed to a nearby chair before calling the police. Trotta stated that Harriel had no visible injuries on her body, which was documented by several photographs that the state entered into evidence. Harriel initially told Trotta that she and Roaden seldom fought, but at a later time she indicated that they sometimes tended to get into a shoving match.
 {¶ 7} Barbara Mirlenbrink, a criminalist with the Cincinnati Police Department, investigated the crime scene. Mirlenbrink observed several stains that appeared to be blood on a stairway landing, wall, and hallway inside the home. Mirlenbrink further testified that a stained and broken knife, shirt, socks, and bleach bottle had been found in a garbage can outside the home. Criminalist Floyd Lanter testified that shorts and underwear, soaked with what Lanter believed to be blood, were also found in a garbage can outside the home. The shorts contained a slight tear in them, and Lanter testified that this tear was consistent with the location of Roaden's stab wound. While investigating, Lanter additionally observed a blood-soaked mattress in the bedroom and a wet mop that reeked of bleach in the kitchen. Lanter further stated that the interior of Harriel's car was tested for blood, but that only one speck of blood behind the driver's seat was found.
 {¶ 8} Deputy coroner Gary Utz testified regarding the cause of Roaden's death. Utz had conducted an autopsy on Roaden and determined that Roaden had died of hemoperitoneum, or a hemorrhage in his abdominal cavity. This hemorrhage was caused by a small stab wound to Roaden's lower hip that perforated his psoas muscle and several smaller blood vessels. The location of this wound indicated that Roaden was most likely stabbed while lying on his back, although Utz stated that it was possible that Roaden was stabbed while standing. Utz further stated that Roaden would have begun bleeding immediately upon being stabbed, and that the depth of Roaden's wound indicated that some force was used to cause the injury.
 {¶ 9} During the autopsy, Utz found approximately one liter of blood in Roaden's abdomen. Utz also testified regarding numerous superficial wounds found on Roaden's body. These wounds occurred earlier than the lethal stab wound and were consistent with defensive wounds. While testifying, Utz examined the broken knife found by the investigating officers. According to Utz, the knife was capable of producing the stab wound on Roaden's body.
 {¶ 10} Gertrude Fultz, Harriel's neighbor, testified that she encountered Harriel around 9:00 a.m. on January 16. Fultz was leaving to go shopping when Harriel walked across the street and told Fultz that her husband was dead. Lubertha Lee, a friend of Harriel's, testified that Harriel called her between 9:00 and 9:30 a.m. on January 16 and told Lee that Roaden was dead. Harriel told Lee that Roaden had been killed at the corner store, and that his body was in the morgue.
 {¶ 11} The state also presented the testimony of Deangelo Young, another neighbor. Young stated that he had seen Roaden sitting in Harriel's car at approximately 1:00 a.m. on January 16, and that Roaden was not wearing a shirt or shoes. Young observed scratches on Roaden's body, and Roaden told Young that he was just relaxing in the car and drinking beer because Harriel had been drinking.
 {¶ 12} After the state's evidence was presented, Harriel raised a CrimR. 29 motion for acquittal on both charges. The trial court granted Harriel's motion on the charge of aggravated murder after concluding that the state had not presented sufficient evidence that Harriel had acted with prior calculation and design. The motion was denied in regard to the charge of murder.
 II. Harriel Testifies {¶ 13} Harriel testified on her own behalf. She stated that she and Roaden had frequent arguments, and that they engaged in one such argument the day before Roaden died. According to Harriel, most of the arguments stemmed from Roaden's excessive drinking and behavior while intoxicated. When questioned about the superficial wounds found on Roaden's body, Harriel stated that she had scratched Roaden on January 14 during an argument the two were having over Harriel's car.
 {¶ 14} Harriel initially testified that she and Roaden began arguing upstairs on January 15. Harriel left the argument and went downstairs to the kitchen and began cutting onions with a knife. But the argument continued, and she returned upstairs. While upstairs, the two began scuffling with the knife, and Harriel thought that Roaden was going to stab her. Harriel stated that the knife must have entered Roaden's side, but she was not aware of such a wound at the time. But Harriel then changed her testimony and stated that she and Roaden scuffled for the knife downstairs, and that he was stabbed in the kitchen.
 {¶ 15} Harriel testified that, after the argument, Roaden went up to bed. He complained about his stomach hurting, and she gave him ginger ale and aspirin. Several hours later, Harriel joined him in bed. She fell asleep and awoke around 1:00 a.m. to find him deceased. Harriel further stated that she changed Roaden's clothes and threw the bloody clothes away before calling 911, and that she also tried to move him from the bed to a chair in the room. But she denied ever using bleach in an attempt to clean the room. On cross-examination, Harriel admitted that she threw these items away because she was afraid people would think she had killed her husband, not because she wanted to make Roaden appear presentable. According to Harriel, she called Lubertha Lee around 1:00 a.m. and told her that Roaden was deceased and still in bed, not in the morgue. Harriel also denied telling Lee that Roaden was killed at the corner store.
 {¶ 16} The defense also briefly presented the testimony of Harriel's daughter, Deljankjuk Harriel. Deljankjuk testified that Roaden was in bed all afternoon and evening on January 15.
 III. Murder Conviction {¶ 17} After all the evidence was presented, Harriel renewed her Crim.R. 29 motion for acquittal regarding the charge of murder. The motion was denied. At the conclusion of closing arguments, the trial court convicted Harriel of murder. She was sentenced to a mandatory fifteen years to life in prison. On appeal, Harriel now raises five assignments of error that we address in turn.
 IV. Sufficiency and Weight of the Evidence {¶ 18} In her first two assignments of error, Harriel argues that her conviction was not supported by the sufficiency or the weight of the evidence. In particular, Harriel argues that the evidence presented did not establish the necessary mental state of "purposefully" that was required for the offense of murder.
 {¶ 19} When analyzing the sufficiency of the evidence to support a conviction, this court must determine "whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt."[1]
 {¶ 20} A review of the weight of the evidence requires this court to sit as a "thirteenth juror."[2] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[3]
 {¶ 21} Harriel was convicted of murder under R.C. 2903.02(A), which states that "no person shall purposefully cause the death of another." Purposeful conduct is defined in R.C. 2901.22(A) as possessing a specific intention to cause a certain result.
 {¶ 22} The trial court was presented with varying testimony concerning the events leading up to and surrounding Roaden's death. Harriel testified that she had accidentally stabbed Roaden in the afternoon and that Roaden remained in bed after their argument. But this was contradicted by Harriel's statements to Officer Sherman and Detective Trotta, which indicated that Roaden had left home in the afternoon and had not returned until late evening. Also conflicting with Harriel's testimony was Deangelo Young's statement that he saw Roaden outside in Harriel's car around 1:00 a.m. on the day he died. Had Roaden been stabbed before Young saw him outside, the evidence would have most likely included Roaden's blood being found in Harriel's car in a quantity greater than "one speck," as was indicated by the investigating officers.
 {¶ 23} Harriel's testimony that a struggle and the stabbing occurred in the kitchen was further contradicted. Deputy coroner Utz testified that Roaden's stab wound would have bled on impact and that Roaden was most likely stabbed while lying down. But no blood was found in the kitchen. Instead, a large amount of blood was found on the bedroom mattress, which supported Utz's testimony. Further, no injuries were found on Harriel's body. Although this did not negate Harriel's testimony regarding a struggle, it certainly did not support it.
 {¶ 24} The trial court was presented with numerous other circumstantial evidence from which it could have reasonably inferred that Harriel had acted purposefully. The court heard testimony that Harriel had thrown away Roaden's bloody clothes, waited hours to call 911, attempted to clean her home with bleach, and told Lubertha Lee that Roaden had been killed at the corner store and was already at the morgue.
 {¶ 25} Our review of the record leads us to conclude that Harriel's conviction was supported by both the sufficiency and the weight of the evidence. We further conclude that the record does not support a determination that Harriel acted in self-defense.
 {¶ 26} Self-defense is an affirmative defense that requires a defendant to show the following elements; (1) the defendant was not at fault in creating the violent situation; (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force; and (3) the defendant did not violate any duty to retreat or avoid the danger.[4] Harriel testified that she and Roaden scuffled over the knife and that she was afraid he was going to stab her. But the record is void of any additional evidence to support these assertions. Because Harriel failed to show that she acted in self-defense, and because her conviction was supported by the sufficiency and the weight of the evidence, we overrule Harriel's first and second assignments of error.
 V. Crim.R. 29 {¶ 27} When reviewing a trial court's ruling on a Crim.R. 29 motion for acquittal, this court applies the same standard of review that we apply to a challenge to the sufficiency of the evidence.[5] Having already determined that Harriel's conviction was supported by sufficient evidence, we conclude that the trial court did not err in denying this motion. Harriel's third assignment of error is overruled.
 VI. Prosecutorial Misconduct {¶ 28} In her fourth assignment of error, Harriel argues that prosecutorial misconduct was committed during closing argument. Specifically, Harriel argues that the prosecutor vouched for the credibility of Deangelo Young and accused Harriel of lying. The record indicates that the prosecutor stated, while summarizing Young's testimony, "I believe Deangelo." And while discussing perceived inconsistencies in Harriel's testimony, the prosecutor further stated, "And only a guilty mind would fabricate such a ridiculous story." Along with these two statements, Harriel asserts, the prosecutor argued facts not in evidence by theorizing on the pain that a stab wound would have caused. Harriel relies on the prosecutor's statement that "[n]ow, I can't say that I've ever been stabbed in the stomach. What I can say, it would require a little bit more than aspirin and Alka-Seltzer to relieve the pain caused by that."
 {¶ 29} Prosecutorial misconduct will only be grounds for error if the misconduct deprived the defendant of a fair trial. The remarks at issue must have been improper and must have prejudicially affected substantial rights of the accused.[6]
When reviewing a claim of prosecutorial misconduct, this court must remember that "the prosecution is normally entitled to a certain degree of latitude in its closing remarks."[7] We must not view the prosecutor's statements in isolation, but rather in light of the entire closing argument.[8]
 {¶ 30} Because Harriel did not object to any of these statements during trial, we review for plain error.[9] We also apply the presumption that, during a bench trial, the trial court "considered only the relevant, material, and competent evidence in arriving at its judgment unless it appears to the contrary."[10]
 {¶ 31} A prosecutor should never vouch for the credibility of a witness.[11] A prosecutor may summarize a witness's testimony and inform the trier of fact of apparent discrepancies or consistencies, but may not "guarantee" the truthfulness of a witness's testimony. In this case, the prosecutor improperly vouched for the credibility of Deangelo Young. But viewing this statement in light of the entire closing argument, we cannot conclude that it rises to the level of plain error.
 {¶ 32} Nor do the remaining statements that Harriel has referred us to constitute plain error. These statements occurred as the prosecutor was pointing out apparent inconsistencies in Harriel's testimony and contrasting Harriel's testimony with that of other witnesses. We conclude that these statements, while ill-advised, were not prejudicial, and we overrule Harriel's fourth assignment of error.
 VII. Blakely and Lesser-Included Offenses {¶ 33} In her fifth and final assignment of error, Harriel argues that her Sixth Amendment right to a jury trial was violated. Particularly, Harriel asserts that the trial court erred "in entering judgment of guilty for murder without a jury finding of the facts necessary to elevate the least serious culpable degree of homicide to the much more serious offense of murder, and in sentencing her to the more severe sentence required for murder."
 {¶ 34} In support of her argument, Harriel purports to rely on the decision of the United States Supreme Court in Blakely v.Washington.[12] In Blakely, the Court held that a defendant's right to a jury trial is violated when a defendant's sentence is enhanced based on facts not found by a jury or admitted by the defendant.[13] Harriel now asks this court to conclude that a defendant's constitutional right to a jury trial is also violated when a defendant is convicted of an offense greater than the least of its lesser-included offenses without a jury first considering the lesser-included offenses.
 {¶ 35} Harriel's argument, albeit novel, is entirely misplaced. Blakely concerned the effect of sentencing enhancements on the Sixth Amendment. It did nothing to alter, and in fact affirmed, a defendant's right to have a prosecutor prove to a jury all facts legally essential to the defendant's punishment.[14] In convicting Harriel of murder, the trial court did not enhance or elevate any other homicide offense. Harriel was indicted for murder, and the state was required to prove the elements of this offense to the trier of fact. The trial court plainly did not find facts beyond the elements of murder in Harriel's conviction and sentencing. Moreover, the court imposed a mandatory sentence upon Harriel. No choice or discretion was involved.
 {¶ 36} We further note that Harriel voluntarily and effectively waived her right to a jury trial. In doing so, she provided the trial court with the responsibility to determine whether the state had proved every element of the offense. Because the trial court found that every essential element of murder had been proved, we reject Harriel's claim that her right to a jury trial was violated.
 {¶ 37} We overrule Harriel's fifth assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
Doan, P.J., and Sundrmann, J., concur.
[1] State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[2] State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.
[3] Id.
[4] State v. Thomas, 77 Ohio St.3d 323, 326, 1997-Ohio-269,673 N.E.2d 1339.
[5] State v. Williams, 74 Ohio St.3d 569, 576, 1996-Ohio-91, 600 N.E.2d 724.
[6] State v. Smith (1998), 130 Ohio App.3d 360, 366,720 N.E.2d 149.
[7] State v. Smith (1984), 14 Ohio St.3d 13, 570 N.E.2d 883.
[8] State v. Kelly, 1st Dist. No. C-010639, 2002-Ohio-6246, at ¶ 22, citing State v. Keenan (1993), 66 Ohio St.3d 402, 410,613 N.E.2d 568.
[9] Id. at ¶ 22.
[10] State v. Lott (1990), 51 Ohio St.3d 160, 166-167,555 N.E.2d 293, 301, quoting State v. Post (1987),32 Ohio St.3d 380, 384, 513 N.E.2d 754.
[11] Smith, 14 Ohio St.3d at 14.
[12] (2004), 542 U.S. 296, 124 S.Ct. 2531.
[13] Id. at 303-304.
[14] Id. at 313.