[Cite as *State v. Neal*, 2015-Ohio-4705.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-140667 |
| | | TRIAL NO. B-1303886 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| CHARLES NEAL, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  November 13, 2015


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J. Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela Stagnaro*, for Defendant-Appellant.




Please note:  this case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1}    Defendant-appellant Charles Neal was indicted for the murder of Quentin Snell, two counts of felonious assault involving Jonathan Austin, two counts of having a weapon under a disability, and six counts of trafficking in heroin. The murder and felonious-assault counts each carried a three-year firearm specification. The trial court, upon Neal's motion, severed the heroin counts from the remaining charges.

{¶2}    Neal subsequently filed a motion to suppress the pretrial identifications of Austin, Neal's former girlfriend Tiffany Hutchen, and two women, Djwana Kernall and Theresa Larkin, who lived on the street where the murder had occurred. Following the denial of his motion to suppress, Neal waived his right to trial by a jury and his case proceeded to trial before the court.

{¶3}    The trial court found Neal guilty of all the charges and the accompanying firearm specifications. The trial court, at the state's request, dismissed all six trafficking-in-heroin counts. At the sentencing hearing, the trial court merged the two felonious-assault counts, the two counts of having a weapon under a disability, and the firearm specifications. The trial court sentenced Neal to 15 years to life for Snell's murder, three years for the merged firearm specifications, eight years for the felonious assault of Austin, and 36 months for the weapon-under-a-disability offense. The trial court ordered all the terms be served consecutively for a total of 29 years to life in prison.

{¶4}    Neal now appeals, raising four assignments of error. He argues that the trial court erred in overruling his motion to suppress the eyewitness identifications of Austin, Hutchen, and Kernall, in permitting the state to impeach Larkin with a prior inconsistent statement, and in sentencing him without

considering the appropriate factors under R.C. 2929.11 and 2929.12 and without making the required findings for consecutive sentences under R.C. 2929.14(C), and that his convictions are against the sufficiency and weight of the evidence. Finding none of his arguments meritorious, we affirm the trial court's judgment.

### Bench Trial

{¶5}     The following evidence was adduced at the bench trial.  Jonathan Austin testified that his cousin Quentin Snell, who was a student at Wright State University, was home visiting on May 25, 2013.  They drove in Snell's Camaro to visit Hutchen, who was a friend, on Bowling Green Court near Moosewood.  Austin had been there once before.  When they arrived, Snell did not want to leave the car, so Austin walked up to the door alone.  Austin noticed several men on the side of the building where Hutchen lived.  Austin went inside, used the bathroom, and spoke briefly to Hutchen before walking back outside.  When he got outside, Neal spoke to him, asking him if he thought "shit was sweet." Austin did not reply, but he took the comment as a threat because Neal was standing within inches of Austin when he said it.

{¶6}     Austin got back inside Snell's car and Snell slowly drove away.  Austin testified that Neal "came out of nowhere," got right next to the car, and fired at them five or six times.  Austin told Snell to drive faster, but it was too late.  Austin got hit by a bullet and then, Austin "woke up, and the car was crashing down the hill, and [he] looked over and just it didn't look too good.  And [he] looked down and [he] was shot." The Camaro had hit other cars as it travelled down the hill.  Snell had been shot in the head and appeared to be dead.  Austin ran to his cousin's house nearby for help.  One bullet had grazed Austin's left eye, and another had hit his left arm and

3

had broken it. Austin had surgery and was in the hospital for several days. He testified his arm had sustained permanent injury.

{¶7} Police visited Austin the night of the shooting and showed him a photo lineup that included Neal's photo, but he did not select Neal's photo from the lineup. Austin did pick Neal out of a second photo lineup, but he was not 100 percent certain. Austin acknowledged that he had identified Neal in court during the motion to suppress hearing, and he had identified Neal in court during the trial as the man who had shot Snell and him.

{¶8} Forensic pathologist Dr. Jennifer Schott responded to the scene. She found Snell dead inside his car with gunshot wounds to his head and upper extremities. She performed the autopsy on Snell's body, which revealed that Snell had died from a bullet to the brain. Schott had recovered the bullet during the autopsy. She testified that the shot to Snell's head was consistent with a person sitting in the driver's seat and being shot from the left.

{¶9} Tiffany Hutchen lived at 3262 Bowling Green Court with her two young children. She testified that she knew Neal as "Chucky," and had met him in April. She smoked marijuana and drank with him, and the two were intimate. They communicated through texting. She recognized his number when it came up on her phone. On May 25, 2013, Hutchen agreed to see Snell, who she knew through Austin. Austin walked up to her door, but Snell stayed in the car.

{¶10} A short time later, as Austin left Hutchen's home, Neal came from around the building, repeatedly saying, "Ain't shit sweet out here" and "Something could happen to you for real." Austin said nothing. He walked to the car to avoid Neal and got inside. Hutchen said, "Chucky was cool at first, and then he just got mad out of nowhere and he walked off and pulled out his gun. * * * And when he got

4

to the sidewalk, I think by the fire hydrant, he started shooting." Hutchen saw Neal shoot at Snell and Austin in the car and heard five or six shots. She was scared and did not know why Neal had shot the two men. She saw Neal run behind her building where there was a trail leading to Moosewood. Hutchen testified Neal had been wearing tan shorts and a "creamish" colored hoodie. She had seen him in the same clothing a couple of times that week.

{¶11} On May 27, 2013, Hutchen told police what happened but did not identify Neal in the photo lineup. She testified that "[w]hen she had seen his picture [she] had to get like a little funny feeling in [her] body, and they asked [her] was it him. And [she] had told them, No." She testified that she had lied to police because she thought that someone could kill her. A month later, Hutchen told police the truth—that Neal was the shooter. Cell phone records showed that Neal had texted Hutchen after the shooting, saying that he loved her. She returned the sentiment for fear that he would kill her if she did not. The same cell phone records showed that right after the shooting Neal had sent a text that said, "Had to duff a Nigga."

{¶12} Theresa Larkin also lived on Bowling Green Court and had known Neal for months. She identified him in a pretrial photo lineup and in court during the suppression hearing. At trial, Larkin substantially changed her testimony from her statement to police and the suppression hearing. She denied having seen Neal on the day of the shooting, and said that she did not remember what she told police. She denied picking Neal out of the photographic lineup.

{¶13} Djwana Kernall did not testify at trial. But both parties agreed to incorporate her testimony from the motion-to-suppress hearing at the trial. At the suppression hearing, Kernall had testified that on May 28, 2013, she had gone to the police station and looked at a photo lineup. She had signed a form explaining the

5

lineup procedure, and she was separately shown a group of six photographs. She picked the photo numbered five, which was Neal's photo. When selecting the photo, she told the person who was administering the lineup that she had seen the man running away from the scene down the trail. She also said he had been wearing "a black hoodie on with [the] hood up." And the "black hoodie was over a white t[-shirt and] white shorts." She said she had "heard his name is Little Chucky. Same height. Same weight, same build." She further stated that he "ha[d] not been in the neighborhood since the shooting." She then identified Neal in court as the person she had seen running down the trail that day.

{¶14} Police recovered seven .40-caliber Smith & Wesson shell casings in the road near 3282 Bowling Green Court, which were analyzed and found to have been fired from the same gun. The police, however, had not recovered the gun. Almost three weeks after the shooting, on June 14, 2013, police officers Eric Schaivle and Christopher Seta responded to 3200 Bowling Green Court for a complaint that Charles Neal, "Chucky," was threatening someone with a gun. The officers accessed Neal's mug shot and found that he was wanted. Schaivle knew Neal and recognized his photograph. Schaivle dropped Seta off at 3251 Moosewood to intercept anyone using the trail that cut through Bowling Green and Moosewood. When Schaivle turned onto Bowling Green Court, he saw Neal holding something wrapped in a shirt. Neal looked at him and fled down the trail toward Seta. Schaivle alerted Seta over the radio.

{¶15} Seta spotted Neal on the trail, shirtless and carrying a balled-up black t-shirt wrapped around an object. He watched Neal hand the shirt to someone else, who was later identified as Markel Hogan. Neal looked up, saw Seta, and ran away. Seta approached Hogan, who laid the t-shirt down and walked away. Police

6

recovered the t-shirt, which was wrapped around a loaded Glock .40-caliber semi-automatic pistol.

{¶16} Police submitted the Glock pistol to firearms examiner Robert Lenoff. Lenoff testified that he had test-fired four bullets from the Glock pistol. Two of the bullets had been submitted with the Glock pistol and two of the bullets were from the laboratory supply. He compared the four test-fired casings to the seven casings found at the scene. He determined that the Glock pistol had fired all seven casings police had recovered from the shooting scene on May 25, 2013. Lenhoff also analyzed the bullet recovered from Snell's body, and while it was too damaged to definitively say that it, too, was fired from the Glock, he stated it was the same caliber bullet and had the same rifling characteristics as the test-fired bullets.

{¶17} Criminalist Don Werling tested the Glock pistol and the magazine for finger prints, but he did not recover any. He testified that it was not unusual that he could not find any prints on the magazine or the Glock pistol, because the finish on weapons is not designed to hold latent prints. After testing the pistol for fingerprints, he then swabbed it for DNA evidence and submitted the swabs for testing.

{¶18} Joan Burke, a serologist and DNA analyst, compared the known DNA samples collected from Neal and Markel Hogan to the DNA evidence recovered from the Glock pistol and the t-shirt. She testified that the DNA evidence on the t-shirt included a mixture from three people, and Neal could not be excluded as a contributor to the mixture that was obtained from the t-shirt. She estimated that the portion of the population that could not be excluded from having contributed to this mixture was approximately one in 2,141,000 individuals. She explained that if she lined up 2,141,000 individuals in a room, she would expect one person's DNA profile

to fit within that mixture, and in this particular instance, Neal's DNA profile did fit within the mixture.

{¶19}    Burke also identified a mixture of DNA on the Glock pistol from four people, including Neal.  She testified that the portion of the population that could not be excluded from having contributed to the mixed profile was approximately one in 1,952 individuals. She testified that if she lined up 1,952 individuals in a room, she would expect one person in the room to have the DNA profile that would fit that mixture, and that Neal, in particular, has the DNA profile that would fit within that mixture.    She also identified a mixture of DNA of three individuals on the Glock magazine, but both Neal and Hogan were excluded as contributors of that DNA.

{¶20}    Officer Chad Koepee testified that he works in the Real Time Crime Center, which is a unit of the Cincinnati Police Department.  He monitors over 100 cameras in the greater Cincinnati area and he retrieves footage from the cameras when necessary for police investigations.  He reviewed and copied video footage from four cameras in the Bowling Green Court and Moosewood area that had been taken around the time of the shooting.  That video footage was played in court and made an exhibit in the trial. It showed Snell's Camaro pulling into the cul-de-sac and a man exiting from the passenger side of the vehicle.  The Camaro then backed up and tapped a garbage can.  The passenger then returned to the vehicle.  The vehicle drove up a little and turned around.  As it did, a man in white shirt and long white shorts walked quickly towards the vehicle.   After the Camaro had turned around, the man in the white clothing walked up to the driver's side of the Camaro, fired shots at the Camaro, and then ran from the scene.  Another video showed the Camaro coming to rest at the intersection of Bowling Green and Moosewood, and then someone exiting from the passenger side of the car.  The video camera, however, was not positioned

8

close enough to capture the actual identities or to distinguish facial features of the individuals in the video.

{¶21} Officer Jason Bley testified that he was part of a police unit that had been investigating Neal prior to the shooting. Neal was homeless, but he "hung out" on Bowling Green Court and Moosewood. Neal had met with a confidential informant, who was wearing a police recording device, the day before the shooting. Officer Bley reviewed the disk from the recording device the confidential informant had been wearing. Still images had been made from the disk, which showed Neal wearing a white shirt and long white shorts. Those images were admitted into evidence at the trial. Officer Bley further testified that the meeting had taken place in the same area that the shooting had occurred.

{¶22} Detective John Horn was working in the homicide unit on May 25, 2013, and was assigned to investigate the murder of Snell and the felonious assault of Austin. When he and his partner, Detective Kirk Ballman, had responded to the scene, it had already been secured by police, and Snell was lying deceased in the vehicle. Austin had been located in a nearby home and had been transported to University Hospital. Horn noticed four video cameras in the area and contacted the Real Time Crime Unit to secure copies of the video from the cameras. While he and Detective Ballman had subsequently viewed the video, along with the assistant prosecutor and defense counsel, Detective Horn testified that none of the witnesses to the shooting had seen the videos, nor had they been made aware of their existence.

{¶23} Detectives Horn and Ballman then traveled to University Hospital where they interviewed Austin. Austin gave them Hutchen's name and phone number. After leaving the hospital, Detective Ballman called Hutchen. She told police a man named Chucky had been the shooter. Police eventually obtained the name Charles Neal and put

9

together a photo lineup containing Neal. This photo lineup was shown to Austin by another police officer, but Austin did not identify anyone.

{¶24} In the meantime, Larkin and Kernall had voluntarily come to the police station on May 28, 2013, and May 29, 2013. After telling police they had seen the shooter fleeing from the area, they were separately shown a photo lineup, which contained Neal's photo, by a blind administrator. They both selected Neal's photo as the perpetrator. Hutchen was also shown the same photo lineup a couple days after the shooting, but she did not identify anyone. Following Neal's arrest, Detective Horn showed Hutchen a single photo of Neal. Hutchen identified him as the perpetrator of the offenses. Detective Horn also obtained a search warrant for Hutchen's and Neal's cell phone records. Horn testified that when Neal was arrested he could not provide an address, so he listed Neal as homeless. He further testified that Neal had submitted to a swab of his cheek for DNA testing.

{¶25} Neal stipulated that he had been adjudicated delinquent for complicity to felonious assault and for illegal possession, use, sale, administration of, and distribution of a drug of abuse.

### Identification Evidence

{¶26} In his first assignment of error, Neal argues the trial court erred as a matter of law by overruling his motion to suppress Austin's in-court identification, and the pretrial identifications of Hutchen and Kernall.

{¶27} Appellate review of a motion to suppress presents a mixed question of fact and law. At a suppression hearing, the trial court assumes the role of trier of fact, and as such, is in the best position to resolve questions of fact and evaluate witness credibility. An appellate court must accept a trial court's findings if competent, credible

10

evidence supports them. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

{¶28} The United States Supreme Court has developed a two-part test for determining whether evidence gathered from an eyewitness's identification must be excluded from trial due to the unduly suggestive nature of the identification procedure. *See Perry v. New Hampshire*, ____U.S.____, 132 S.Ct. 716, 724, 181 L.Ed.2d 694 (2012). Under the first part of the test, the court must determine whether the pretrial identification procedure employed by the police was "both suggestive and unnecessary." *Id.*, citing *Manson v. Brathwaite*, 432 U.S. 98, 107, 109, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). But "[e]ven when the police use such a procedure * * * suppression of the resulting identification is not the inevitable consequence." *Id.* Rather, the court must move to the second step of the test, which requires an inquiry into "whether under the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive." *Id.* In the second step, the court should focus on a number of factors in evaluating the witness's ability to make an accurate identification, which include (1) the witness's opportunity to view the defendant during the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the suspect, (4) the witness's certainty, and (5) the time elapsed between the crime and the identification. *Id.* at fn.5, quoting *Manson* at 114; *see also Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). If an identification resulting from an

unduly suggestive procedure is nevertheless deemed reliable, it is admissible, notwithstanding the improper procedure used by the police. *Perry* at 725.

{¶29} When determining whether to suppress an eyewitness identification, a court should not consider the reliability of the eyewitness evidence, i.e. engage in part two of the test, unless the defendant satisfies the requirements of part one of the test by proving that the police employed an unduly suggestive identification procedure. *See id.* at 730; *see also State v. Green*, 117 Ohio App.3d 644, 653, 691 N.E.2d 316 (1st Dist.1996). Stated conversely, if there is no showing that the police employed an unduly suggestive procedure to obtain an identification, then the unreliability of the identification alone will not preclude its admission at trial. Instead, such unreliability should be exposed through the rigors of cross-examination at trial. *Perry* at 728-729; *see also State v. Hogan*, 10th Dist. Franklin No. 11AP-644, 2012-Ohio-1421, ¶ 11.

{¶30} In *Perry*, the Supreme Court clarified that the "[t]he due process check for reliability comes into play only after the defendant establishes improper police conduct." *Perry* at 726. Thus, the court explicitly stated that it had "not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers." *Id.* at 720-721. The Supreme Court reached this conclusion by noting that the undue-suggestiveness framework is not premised on the unreliability of the evidence alone, but turns on the presence of state action and aims to deter the police from rigging identification procedures. *Id.*

{¶31} Thus, the Supreme Court limited the scope of first part of the undue-suggestiveness test to situations where the police were the cause of the undue suggestiveness. The court concluded that "[w]hen no improper law enforcement activity is involved," reliability is better tested with such tools as "the presence of counsel at

postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instruction on both the fallibility of eyewitness identification, and the requirement that guilt be proved beyond a reasonable doubt." *Id.* at 721.

### *Austin's In-Court Identification*

{¶32}   Neal first argues that the trial court should have suppressed Austin's in-court identification at the suppression hearing. He contends that because Austin could not positively identify him in the two photo lineups, Austin's in-court identification was the equivalent of a one-on-one show up, which was inherently suggestive.  He further argues that Austin's identification was not reliable, because it differed from the description Austin had provided police on the night of the shooting.

{¶33}   In *State v. Johnson*, 163 Ohio App.3d 132, 2005-Ohio-4243, 836 N.E.2d 1243 (10th Dist.), the Tenth Appellate District addressed the admissibility of a pretrial in-court identification by a witness at a juvenile bindover proceeding.  The witness, like Austin, had been unable to positively identify the defendant from a photo array.  The juvenile was bound over to the common pleas court, but the common pleas court suppressed the identification.  *Johnson* at ¶ 55. The Tenth Appellate District reversed.  It found that while the first part of the two-part test for addressing the admissibility of a pretrial identification had been met, because "an in-court identification typically occurs under circumstances which reflect the identity of the defendant," the second part of the test had not been satisfied.  *Id.* at ¶ 54-55.  In concluding that the witness's in-court identification was reliable under the totality of the circumstances, the Tenth District focused on a number of factors including that no suggestive out-of-court procedures had occurred, which would have invalidated the in-court identification, the witness had made the identification in-court under oath and had been subjected to cross-examination, the witness had been standing

within a few feet of the defendant and had been staring at his eyes, the witness had been confident in her identification, and the testimony of other witnesses had revealed the witness's certainty in the identification. *Id.* at ¶ 56-59.

{¶34} Likewise, in *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 57 (10th Dist.), the Tenth Appellate District, followed *Johnson* and rejected a defendant's challenge to the pretrial in-court identification testimony of several witnesses at the suppression hearing, who had been unable to identify the defendant in a photo array. The Tenth District noted that the witnesses had made their identifications under oath and were subject to cross-examination, they expressed confidence in their identifications, and their identifications were otherwise reliable under the totality of the circumstances. *Monford* at ¶ 61-66.

{¶35} Similarly, here, the trial court did not err in failing to suppress Austin's in-court identification under the totality of the circumstances. At the hearing on the motion to suppress, Austin testified that had he had previously been shown two photo lineups. The blind administrator of the first lineup testified that while Austin was unable to identify the shooter, he had lingered on two photos, one of which was Neal's photo. Austin was then shown a second photo lineup, by another blind administrator, in which Neal's photo had been changed to a different position in the lineup. Austin quickly eliminated the first and second photos, but he picked up the third photo, which was Neal's photo. He studied it, and said, "This could be the guy, but I am not 100% sure." He then went on to eliminate the photos numbered four, five, and six in the lineup. He then said, "I am not 100% sure. I looked at the guy in the eyes and that guy in the number three position has something the others don't."

{¶36} At the suppression hearing, Austin stated that his in-court identification was based on his own observations and his memory of the shooting. Austin made the identification under oath and he was subjected to cross-examination. Austin testified that it was clear and sunny the day of the shooting and that nothing had obstructed his view of Neal. He had seen Neal two times that day and both times he had been within inches of Neal. Austin admitted on cross-examination that his observation of Neal was not fleeting. He had had an opportunity to observe him for a moment and he was confident that Neal was the shooter. The fact that Austin's description of Neal may have been different the night of the shooting was but one of the *Neil-Manson* factors for the court to weigh. As a result, we cannot say the trial court erred in failing to suppress Austin's in-court identification.

### Hutchen's Pretrial Identification

{¶37} Neal next challenges Hutchen's pretrial identification. He argues that her pretrial identification was tainted by Detective Horn's unnecessarily suggestive use of a single photograph and that her identification was not otherwise reliable. He points to the fact that Hutchen was initially unable to identify him in the first photo lineup that was conducted days after the shootings.

{¶38} Hutchen failed to appear at the hearing on the motion to suppress. The state and Neal agreed that the state could proffer Hutchen's testimony. The state proffered the following testimony: On May 27, 2013, two days after the shooting, police showed Hutchen the same six-photo lineup that Austin had been shown. She did not pick anyone out of the lineup. Later, on June 26, 2013, after Neal had been arrested, Hutchen spoke to police and stated that she had had an intimate relationship with Neal. She knew him as "Chucky." They had talked on the

15

phone.  They had texted each other.  They had in-person contact for a period of time.  The police then showed her a single photograph, which they identified as Charles Neal, to confirm her identification of Neal.  Hutchen identified Neal as the "Chucky" who had been the shooter.

{¶39}   Detective John Horn, who had interviewed Hutchen, also testified at the motion-to-suppress hearing.  He testified that he had spoken with Hutchen on June 26, 2013.  She was with Neal at the time he was arrested, and Neal had a key to Hutchen's apartment.  Hutchen told Horn that she had a relationship with Neal. She knew him from the neighborhood and they were friends.  She said she had known him for five or six months. She told Horn that she had witnessed the shooting and the shooter was a man named "Chucky."  Prior to showing Hutchen the single photograph, Detective Horn told Hutchen that he had additional information, primarily through text messages, that Hutchen had not been entirely honest about her relationship with Chucky.  Hutchen nodded her head, and told police she wanted to tell the truth.  Horn testified that because Hutchen had admitted she knew who Chucky was, he showed her a single mugshot photo of Neal.  Hutchen identified Neal as the "Chucky" she had seen shooting at Snell and Austin.

{¶40}   In *State v. Huff*, 145 Ohio App.3d 555, 556, 763 N.E.2d 695 (1st Dist.2001), this court acknowledged that a one-photograph procedure can be unduly suggestive, but we, nonetheless, held that the identification in that case was reliable, because the defendant had been identified by name as someone the victims knew before they had been shown the photograph.   Thus, we concluded their identifications were reliable, because they had identified the defendant on a basis independent from the photograph.

16

**{¶41}** Similarly, here, while the use of a one-photo procedure was arguably suggestive, Hutchen's identification of Neal was nonetheless reliable under the totality of the circumstances. At the time Detective Horn showed Hutchen Neal's photo, she had already acknowledged that she had known Neal several months prior to the offenses and that they had an intimate relationship. Neal's photo was shown to her, not to identify an unknown attacker, but to confirm Neal's identity as the "Chucky" whom she had told police had committed the offenses. Thus, the trial court did not err in failing to suppress her pretrial identification of Neal. *See Huff*; *see also State v. Levingston*, 1st Dist. Hamilton No. C-090235, 2011-Ohio-1665, ¶ 9; *State v. Nix*, 1st Dist. Hamilton No. C-030696, 2004-Ohio-5502, ¶ 21; *State v. Kaiser*, 56 Ohio St.2d 29, 32, 381 N.E.2d 633 (1978).

### Kernall's Pretrial Identification

**{¶42}** Finally, Neal challenges Kernall's pretrial identification at the hearing on the motion to suppress. He argues that Kernall's identification should be suppressed, because she admitted on cross-examination at the suppression hearing that she was focused on her child at the time of the shooting and did not have time to truly look at the individual running down the trail. Thus, she had not seen Neal's face, but had identified him based solely upon his clothing.

**{¶43}** Neal's argument focuses only on why Kernall's identification should not have been accepted as reliable, and not on whether the photo identification procedure, itself, was unduly suggestive. But before we can focus on the second part of the test, i.e. the *Neil-Manson* "reliability" factors, we must first determine that the police-conducted identification was impermissibly suggestive. Neal put on no evidence that the identifications procedures used by the police were impermissibly suggestive. The testimony at the suppression hearing demonstrated that the police

had complied with R.C. 2933.83, which governs the administration of photo lineups, when showing Kernall the photo lineup. Because there is no evidence that the photo lineup that was shown to Kernall was impermissibly suggestive, nor is there any suggestion that Kernall's in-court identification was the result of any overreaching by the prosecuting attorney or police, any questions regarding the reliability of Kernall's pretrial identification were an issue of weight for the trier of fact to determine at trial. *Perry*, ___ U.S. ___, 132 S.Ct. 716, 181 L.Ed.2d 694; *see State v. Stone*, 1st Dist. Hamilton No. C-140028, 2014-Ohio-4444, ¶ 32. Therefore, the trial court did not err in failing to suppress her testimony. We overrule Neal's first assignment of error.

### The State's Impeachment of Larkin

{¶44} In his second assignment of error, Neal argues the trial court erred by permitting the state to impeach its own witness, Theresa Larkin, in violation of his right to a fair trial.

{¶45} Evid.R. 607 permits a party to impeach its own witness upon a showing of surprise and affirmative damage. *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 27. Neal argues that the state did not make the required showing of surprise or affirmative damage before reading from Larkin's prior statements during its direct examination of Larkin at trial. Neal concedes, however, that he did not object, so he has waived all but plain error. Reversal for plain error is warranted only if the outcome "clearly would have been different absent the error." *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Given our review of the record, we find no plain error.

{¶46} The record reflects that Larkin's testimony at the suppression hearing was consistent with her prior statement to police. Larkin testified that she had known Neal or "Chucky" from the neighborhood for about a year. After she

heard shots, she saw Neal running down the street and down the trail holding a gun. He was wearing all white, and had been for a couple of days. She picked him out of a photo lineup and identified him in court.

{¶47} One week later at trial, however, Larkin testified that she had only known Neal for a couple of months. She said she did not tell police that she knew him from the neighborhood. She denied recognizing him the day of the shooting. The prosecutor asked Larkin to look at a transcript of her prior statement to police to refresh her recollection. Neal did not object. After reviewing the transcript, Larkin acknowledged that it "sort of" refreshed her recollection. Larkin then stated that on the day of the shooting, Neal may have been wearing white shorts and a gray shirt, but she wasn't sure. Larkin admitted that she had told police Neal was wearing a white shirt and white hoodie. She admitted that she had said, "I knew this because he's been wearing it for like the last week probably." When asked to confirm Neal's identity in court, she said she was not sure.

{¶48} The assistant prosecuting attorney then began reading some of Larkin's prior statements to police and her prior testimony at the suppression hearing and questioning her about them. Defense counsel objected after several of these questions and asked the assistant prosecuting attorney if he intended to declare Larkin a hostile witness. The assistant prosecutor stated that he did. The state then asserted it had made the necessary showing of surprise and affirmative damage to question Larkin. The trial court agreed, and permitted the assistant prosecuting attorney to question Larkin as if on cross-examination. The assistant prosecuting attorney then elicited the remainder of Larkin's testimony in that fashion.

{¶49} We agree with the state that the assistant prosecuting attorney initially used the transcript of Larkin's prior statement to police merely to refresh her

recollection. *See* Evid.R. 612. When it became clear that Larkin was not going to testify in accordance with her prior statements, the state, following defense counsel's objection, moved to impeach Larkin with those prior statements. While the assistant prosecuting attorney did read some of Larkin's prior police statements and her testimony at the suppression hearing to her before defense counsel had lodged an objection, which was more indicative of an impeachment technique than an attempt to refresh her recollection, we cannot conclude these instances of improper questioning rose to the level of plain error. Larkin's testimony was merely cumulative to the eyewitness testimony provided by Austin, Hutchen, and Kernall. *See State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996); *State v. Harriel*, 1st Dist. Hamilton No. C-040771, 2006-Ohio-2616, ¶ 30. Neal's case, moreover, was tried to the court and the usual presumption that a trial court considered only relevant evidence applies. *State v. Smith*, 61 Ohio St.3d 284, 292, 574 N.E.2d 510 (1991). We, therefore, overrule his second assignment of error.

### Weight and Sufficiency of the Evidence

{¶50} In his third assignment of error, Neal challenges the sufficiency and the weight of the evidence adduced to support his convictions.

{¶51} When reviewing the sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in a light most favorable to the state and determine whether such evidence could have convinced any rational trier of fact that the essential elements of the crime had been proved beyond a reasonable doubt. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. A review of the manifest weight of the evidence puts the appellate court in the role of a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We must review the

20

entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.* A new trial should be granted only in exceptional cases where the evidence weighs heavily against the conviction. *Id.*

{¶52} Neal argues that the state failed to present sufficient evidence to establish that he was the perpetrator of the offenses. But the testimony of Austin and Hutchen, if believed, placed Neal outside Hutchen's townhome with a gun in his hand shooting multiple times at Snell and Austin. Kernall and Larkin also made a pretrial identification of Neal as the person they saw running from the scene. Neal was later seen by Officers Schiable and Seta, who had responded to an aggravated-menacing call in the same area where the murder had occurred, carrying a black t-shirt with a Glock pistol wrapped inside it. The t-shirt and the Glock pistol were submitted for DNA testing and they both contained a mixture of DNA, from which Neal's DNA could not be excluded. The firearms examiner testified that all seven casings recovered at the murder scene had been fired from the Glock pistol. Although the bullet taken from Snell could not be positively matched to the Glock pistol, the firearms examiner testified that it had the same class characteristics as the test-fired bullets and could not be excluded as having been fired from the Glock pistol.

{¶53} Police obtained text messages on Neal's and Hutchen's cell phones linking Neal to Hutchen the day of the shootings, and a text message on Neal's phone shortly after the shooting, stating that he had "to duff a nigga." Still pictures, which had been made from a recording device that had been worn by a confidential informant who had met with Neal the day before the shooting, showed Neal wearing a white t-shirt and long white shirts. Video surveillance from separate cameras in

the area of the shooting showed a man matching Neal's description and wearing a white t-shirt and long white shorts walk up to Snell's vehicle and fire multiple gunshots at the car before running away. We conclude that a rational fact finder, viewing this evidence in the light most favorable to the state, could have found that the state had proved beyond a reasonable doubt that Neal was the perpetrator of the offenses.

{¶54} Neal also challenges the weight of the evidence. He first contends that his conviction was against the manifest weight of the evidence, because police did not recover his fingerprints on the Glock pistol or the magazine inside it. Despite this lack of fingerprint evidence, there was other evidence linking Neal to the murder weapon. The Glock pistol was found in Neal's possession three weeks after the murder. Neal's DNA could not be excluded from the mixture of DNA on the black t-shirt surrounding the Glock pistol or on the mixture of DNA found on the pistol, itself.

{¶55} Neal also challenges the testimony of Austin, Hutchen, Larkin, and Kernall. He points to inconsistencies in their testimony. But the inconsistencies he raises were pointed out by defense counsel during his cross-examination of these witnesses at trial and were highlighted again by defense counsel during his closing argument. The trial court, as the trier of fact, was in the best position to weigh these witnesses' testimony and it was free to believe all, part, or none of any witness's testimony. *See State v. Antill*, 176 Ohio St.2d 61, 67, 197 N.E.2d 548 (1964). In light of the ample physical evidence produced by the state at trial, which corroborated the eyewitness testimony, we cannot conclude that the trial court clearly lost its way and created a manifest miscarriage of justice in finding Neal guilty of the charges against

him. Having concluded that his convictions were not against the manifest weight of the evidence, we overrule his third assignment of error.

### Sentencing

{¶56} In his fourth assignment of error, Neal argues that his sentence is contrary to law. He argues the trial court failed to make the necessary findings for imposing consecutive sentences and to fully consider the purposes and principles of sentencing in R.C. 2929.11 and 2929.12.

{¶57} In *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus, the Ohio Supreme Court held that if a trial court imposes consecutive sentences, it must not only announce the requisite consecutive-sentencing findings at the sentencing hearing, but it must also incorporate those findings in the sentencing entry.

{¶58} The record reflects that the trial court complied with *Bonnell*. It stated the required findings for consecutive sentences during the sentencing hearing. The trial court stated that consecutive sentences were necessary to protect the public and punish the offender, and were not disproportionate to the seriousness of Neal's conduct and the danger he posed to the public. In addition, the court made the findings under R.C. 2929.14(C)(4)(b) and (c). It stated that the harm caused by two or more of the offenses was so great or unusual that no single prison term for any offense committed as part of the course of conduct would adequately reflect the seriousness of Neal's conduct and that Neal's conduct showed a need to protect the public. The trial court journalized a sentencing-findings worksheet that included these findings and it also incorporated these consecutive-sentencing findings into the sentencing entry.

{¶59} Neal further asserts that the trial court failed to truly consider the purposes and principles of sentencing as set forth in R.C. 2929.11 and the factors in R.C. 2929.12 when imposing maximum sentences for the offenses. We disagree.

{¶60} While the trial court did not need to make any findings under R.C. 2929.11 and 2929.12, it, nonetheless, completed a sentencing worksheet, which specifically referred to the purposes and principles of sentencing in R.C. 2929.11 and to the factors under R.C. 2929.12. *See State v. Brown*, 1st Dist. Hamilton Nos. C-100309 and C-100310, 2011-Ohio-1029, ¶ 14. The trial court checked a number of the factors under R.C. 2929.12(B) and (D) on the sentencing-findings worksheet relating to the harm to the victims and Neal's criminal history. The trial court also stated these findings on the record at the sentencing hearing. The trial court stated that Neal was 23 years old, and that he had been committed to the Department of Youth Services as a juvenile for complicity to felonious assault. His prior adult record consisted of one felony and four misdemeanor convictions. He had failed three times to successfully complete misdemeanor probation and had failed one time to successfully complete felony probation. As a result of his criminal history, the court stated that he was at a high risk to reoffend. The court also noted that the victim and arresting officer had asked the court to impose the maximum sentence for each offense. Thus, Neal's argument that the trial court had failed to consider the purposes and principles of sentencing is not well taken. *See State v. Carmen*, 1st Dist. Hamilton No. C-120692, 2013-Ohio-3325, ¶ 21. Having found both of Neal's sentencing arguments meritless, we overrule his fourth assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**HENDON, P.J.,** and **MOCK, J.,** concur.

24

Please note:

The court has recorded its own entry this date.

